United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JESSE JAMES MARQUEZ,<br>Defendant. | Case No. 18-cr-00197-CRB-1<br><br>**ORDER GRANTING MOTION TO REVOKE DETENTION ORDER** |

The indictment in this case alleges that Defendant Jesse Marquez stole fifty-five firearms from a sporting goods store in Eureka in August 2015, and has trafficked those firearms in the years since. See Indictment (dkt. 1) (filed May 10, 2018). Marquez moves to revoke Magistrate Judge Illman's order that Marquez be detained pretrial, asking that he be released on the conditions recommended by Pretrial Services, which include residing at a halfway house. See Mot. (dkt. 19). The government asks that the Court detain Marquez both on flight and danger to the community grounds. See Opp'n (dkt. 21) at 1. This Court reviews Judge Illman's order de novo. 18 U.S.C. § 3145(b); United States v. Koenig, 912 F.2d 1190, 1191 (9th Cir. 1990). Following a motion hearing on September 14, 2018, and a subsequent assessment of Marquez by New Bridge on September 25, 2018, the Court hereby GRANTS the motion and revokes the detention order.

Under 18 U.S.C. § 3142(b), the court shall release a defendant on personal recognizance or appearance bond, unless the Court "determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." Courts may impose conditions that they deem necessary to guard against a defendant's flight or danger to the community. 18 U.S.C. §

3142(c). In deciding whether conditions could reasonably assure the defendant's appearance and the safety of the community, courts are to evaluate: the nature and circumstances of the offense charged, including whether it involves a firearm; the weight of the evidence against the person; the history and characteristics of the person, including family ties, length of residence, past conduct, drug or alcohol abuse, and criminal history; and the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g). "[T]he weight of the evidence is the least important" factor. See United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985). Moreover, pretrial release "should be denied only for the strongest of reasons." Id. at 1407.

Judge Illman held a detention hearing on July 16, 2018. Opp'n at 3. Marquez requested that his release be secured by sureties including his current girlfriend in Eureka, Lacy Mitchell, and/or his mother and stepfather in Oregon. Id. He also argued that his lack of criminal history supported his request. Id. The government proffered evidence about the crime at issue and about Marquez's flight from Oregon. Id. Judge Illman ruled that the government had preliminarily shown that detention was appropriate. Id.; Preliminary Detention Order (dkt. 8) at 1–2. He ordered a full bail study and set a further detention hearing for August 6, 2018. Id.

Pretrial Services prepared a report before the August 6 hearing, and Judge Illman issued an Order of Detention citing to information from that report, including:

1. The proposed signatories for the unsecured bond are either on probation (mother) or have an extended criminal history (stepfather);
2. Marquez used an alternate social security number in the past;
3. When Eureka police served a DNA warrant on Marquez (because blood was found at the scene of the firearm theft), Marquez disappeared and it took a "vast amount of resources to find and arrest" him thereafter;
4. In addition to the fifty-five firearms stolen, the lower receiver of an AR-15 rifle was also stolen;

2

5. One of the stolen firearms was used to shoot a law enforcement officer and another was found in the possession of a fugitive in Georgia;

6. Defendant has been recorded on jail calls discussing cocaine, marijuana and alcohol use; and

7. Marquez's Instagram profile shows him with a firearm.

See Detention Order (dkt. 14) at 2. Judge Illman noted that Marquez had offered no witnesses or proffers regarding the suitability of his sureties, and Judge Illman concluded that the sureties were unsuitable. Id. at 2–3. He held that "[b]ecause of the havoc wreaked by the firearms that have been recovered and the potential for significantly more danger to the community from the 40 firearms still unaccounted for, and for the same reasons given in the court's order of temporary detention" there was no set of conditions that could assure the safety of the community. Id. at 3.

The Court concludes that neither prong of 18 U.S.C. § 3142(b) is met.

### A. Serious Flight Risk

In September 2017, the government obtained search warrants to seize DNA samples and finger and palm prints from Marquez. Opp'n at 2. Agents visited Marquez at his home in Oregon and obtained a DNA sample from him on September 29, 2017. Id. When they obtained the sample and prints from him, he made a statement to the effect of "I guess I'll see you again soon." Id. The DNA analysis did not come back from the lab until May of 2018. Id. The government asserted in its briefing that when agents returned to the Oregon address with an arrest warrant, they learned that Marquez had left the area and relocated to California "shortly after" providing the DNA sample. Id. at 2–3. In fact, at the motion hearing, the Court learned that Marquez left Oregon sometime in December of 2017— two or three months after the agents' initial visit.

When he left Orgon, Marquez moved to a spare room at a friend's house in Eureka California, working for $250 a day as a farm hand in the marijuana fields of the North Coast. Id. at 1, 4; 6–7. He left behind his mother, stepfather, then-girlfriend and toddler

1    son. Id. at 4. He did not turn himself in or contact law enforcement when he was in
2    California, although his girlfriend asserts that he "had plans to turn himself in after the
3    30th of July, 2018." Mot. Ex. A. Id. When Marquez was referenced in a newspaper
4    article during that time, he asked to be identified by his first name only. Id.

5    The record does not reflect what was involved in law enforcement's efforts to track
6    Marquez to Eureka, see Detention Order at 2 ("it took a vast amount of resources to find
7    and arrest Defendant thereafter"), nor any details of his previous use of an alternate social
8    security number, see id. Marquez did not address the risk of flight in his motion, other
9    than to note that Judge Illman's Detention Order did not mention it, and that, while the
10   Preliminary Detention Order mentioned flight, it did not discuss a serious risk of flight.
11   See Mot. at 5 n.1; Preliminary Detention Order at 2 ("the Court finds that defendant is a
12   risk of flight due to his continuous moving around since the date of the offense and the
13   record of his lack of ties to this District.").

14   Nonetheless, the Court is unconvinced that Marquez fled Oregon because of the
15   DNA test, or that he hid out in California to avoid its consequences. Although the Court
16   shares Judge Illman's concerns that Marquez's proposed sureties might lack moral suasion
17   over him, the Court agrees with Pretrial Services that "there may be a combination of
18   stringent release conditions to mitigate the" risk of non-appearance or flight. The New
19   Bridge Foundation found that Marquez "is appropriate for residential treatment," and
20   stated that New Bridge "would be willing to accept him into their program." Specifically,
21   the Court agrees with Pretrial Services that New Bridge's "policy of sending a senior peer
22   escort with [Marquez] to any preapproved offsite activity, combined with the very limited
23   scope of allowed activities and time away from the program . . . will adequately mitigate
24   any risk that [Marquez] will deviate from the approved leave activities." The Court also
25   finds that a GPS tracking device would further alleviate the risk of flight. These conditions
26   should "reasonably assure the appearance of the person" per 18 U.S.C. § 3142(b).

### B. Risk to Community

Nor does the Court find that Marquez poses a clear and convincing danger to the community if released to New Bridge.

The nature and circumstances of the offense charged involved fifty-five firearms. While fifteen of the firearms have been recovered, two at crime scenes, law enforcement does not know where the other forty are. See Opp'n at 2. If the Court believed that Marquez still had control of those firearms, or an ability to access them, it would view this prong quite differently. But the Court saw no evidence of this. It has been over three years since the theft. Although the government points out that Marquez's Instagram account includes pictures of him with firearms, the detective involved did not believe that any of those pictured firearms were among the fifty-five stolen firearms. Marquez represented at the motion hearing that they are not.

The weight of the evidence is apparently significant here, as there is DNA evidence linking Marquez to the crime scene. Although Marquez, who is twenty-two, has no prior adult convictions, nor any contact with law enforcement since the instant offense in August 2015, other characteristics weigh against him, such as his eleven contacts with law enforcement as a minor, see Opp'n at 6, his lack of family ties, the short length of his residence in this district, and his references to drug use in his recent jail calls. And Marquez does not appear to have a history of violence. See Opp'n at 5–7.

As to the nature and seriousness of the danger to any person or the community posed by the person's release, the Court is unpersuaded by the government's arguments. The government spoke at the motion hearing of the "ongoing present danger" of illegal weapons being released into society. While of course the dissemination of stolen weapons is a danger, that danger has apparently already occurred. If Marquez no longer has control of or access to the forty missing firearms, then Marquez does not necessarily pose any additional danger by being at New Bridge rather than in government custody. The Court therefore concludes that releasing Marquez to New Bridge, with leave only for legal and pretrial visits, and court and medical appointments, on a $75,000 unsecured bond, ordering

that he wear a GPS tracking device, and directing that he follow the special conditions outlined by Pretrial Services in its September 28, 2018 Prebail Addendum Report will guard against flight and danger to the community. See 18 U.S.C. § 3142(c). For the foregoing reasons, the Court GRANTS the motion and revokes the Detention Order. The parties shall appear before the Duty Magistrate Judge to execute the bond. Marquez shall return to the Duty Magistrate Judge in ninety days to address his transition from New Bridge.

**IT IS SO ORDERED.**

Dated: October 3, 2018



CHARLES R. BREYER
United States District Judge